## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD KAHN *and* AARK | : | |
| ENTERPRISE LLC *d/b/a* | : | |
| MAULDIN'S, *individually and on* | : | |
| *behalf of all others similarly situated*, | : | 1:20-cv-781 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| PENNSYLVANIA NATIONAL | : | |
| MUTUAL CASUALTY INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |

## **MEMORANDUM**

### **February 8, 2021**

This case arises from the economic havoc wrought by the COVID-19

pandemic.  Plaintiffs operated a restaurant that, like far too many businesses across

the country, had no choice but to close its doors soon after the virus reached the

United States last spring.  Plaintiffs submitted a claim to their insurance company,

hoping that their business losses would be covered in their all-risk policy.

Unfortunately for Plaintiffs, their insurance company rejected their claim.  Like

thousands of similarly situated business owners, Plaintiffs challenged that denial in

1

federal court.[1]  The vast majority of courts analyzing these claims have sided with the insurers, largely agreeing that the commercial insurance policies unambiguously foreclosed coverage where the business property suffered no physical damage or any tangible injury other than pure economic loss.[2]  We wholeheartedly regret that business owners across the country, who paid hundreds if not thousands of dollars in monthly premiums under the impression that they would be protected in the event a calamity forced them to close their doors to the public, have had little to no luck seeking recourse in federal court.  But upon review of the pleadings and the relevant case law, we are compelled to agree with most of our colleagues.  For the following reasons, we will grant Defendant's Motion to Dismiss.

I.     BACKGROUND

A. Factual Allegations and Procedural History

In accordance with the standard of review applicable to a motion to dismiss, the following facts are derived from Plaintiffs' Amended Complaint, (Doc. 22), and viewed in the light most favorable to them.

---

[1]     By one measure, nearly 1,500 COVID-19 insurance disputes were filed in state and federal court in 2020.  *See Covid Coverage Litigation Tracker*, UNIVERSITY OF PENNSYLVANIA CAREY LAW SCHOOL, https://cclt.law.upenn.edu/.

[2]     The Penn Law Covid Coverage Litigation Tracker estimates that out of 168 cases where motions to dismiss have been adjudicated on the merits, nearly 82% have been fully dismissed as of today's date.  *See Judicial Rulings on the Merits in Business Interruption Cases*, UNIVERSITY OF PENNSYLVANIA CAREY LAW SCHOOL, https://cclt.law.upenn.edu/judicial-rulings/.

Plaintiffs formerly owned and operated a restaurant named "Mauldin's," named for the South Carolina town in which it was located.  (Doc. 22 at ¶¶ 2, 10). In September 2019, Plaintiffs obtained an "all-risk" commercial insurance policy (the "Policy") from Defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn Mutual" or "Defendant"), which is headquartered in Harrisburg, PA.  (*Id.* at ¶¶ 12–13, 15).  An "all-risk" insurance policy covers all risks of loss unless expressly excluded.  (*Id.* at ¶ 15).  Plaintiffs' Policy was intended to provide a full year of coverage, to expire on September 19, 2020.  (*Id.* at ¶ 13).  Six months later, however, the COVID-19 crisis spread to the United States.

South Carolina officials reported the first instances of COVID-19 in the state on March 6, 2020.  (*Id.* at ¶ 23).  The following week, on March 13, Governor McMaster declared a state of emergency and closed schools in two counties.  (*Id.* at ¶ 24).  On March 14, the South Carolina Department of Health recommended that symptomatic individuals avoid public gatherings and stay home from work and school.  (*Id.*).  By March 20, Governor McMaster had closed schools, "urged" citizens to cancel, postpone, or reschedule public gatherings, and encouraged social distancing.  (*Id*. at ¶ 25).  One week later, on March 27, Greenville County (where Mauldin's is located) reported the first death connected to COVID-19, and a Department of Heath physician advised the public to stay home and avoid non-essential public interactions.  (*Id.* at ¶ 26).  On April 6, Governor McMaster issued

3

a statewide order requiring all residents to limit movement outside their homes or places of work to only essential activities.  (*Id.* at ¶ 28).

Because South Carolina residents were advised to stay home, Mauldin's suffered a significant loss of business.  (*Id.* at ¶ 29).  By late March, Plaintiffs "were forced" to close the restaurant.  (*Id.*).  Hoping that their loss of business income would be covered by the Policy, Plaintiffs submitted a claim to Defendant.  (*Id.*).  On March 31, 2020, Defendant denied the claim.  (*Id.*).

Plaintiffs initiated this putative class action on May 12, 2020.  (Doc. 1). Defendant filed a motion to dismiss on June 19.  (Doc. 7).  On June 25, Plaintiffs moved for a stay of proceedings pending resolution by the Judicial Panel on Multidistrict Litigation ("JPML") of their motion to transfer the action, along with hundreds of other related cases, to centralized pretrial proceedings pursuant to 28 U.S.C. § 1407.  (Doc. 13).  To avoid against any potential prejudice to Defendant, we ordered a limited (forty-five day) stay of proceedings and instructed the parties to alert the Court of the JPML's ruling on Plaintiffs' motion to transfer.  (Doc. 25). Before we so ruled, Plaintiffs filed an Amended Complaint, which is now the operative pleading in this action.  (Doc. 22).  The Amended Complaint asserts three causes of action arising out of Defendant's denial of insurance coverage: breach of contract (Count I), breach of the duty of good faith and fair dealing (Count II), and declaratory relief (Count III).  (Doc. 22 at ¶¶ 48–66).

4

On August 14, Defendant advised the Court that the JPML denied transfer to a centralized proceeding.  (Doc. 27).  Accordingly, Defendant re-filed its Motion to Dismiss (the "Motion") on September 2, (Doc. 31), with a brief in support on September 8, (Doc. 34).  Plaintiffs filed their brief in opposition to the Motion on September 30, (Doc. 42), to which Defendant replied on October 14, (Doc. 14).  The Motion is therefore ripe for review.

**B. The Insurance Policy**

The Policy contains several provisions relevant to the motion *sub judice*.[3]

First, the Policy's "Business Income" coverage provision states:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  The loss of damage must be caused by or result from a Covered Cause of Loss. . . .

(Doc. 31-1 at 56).  Defendant also agreed to pay for certain "Extra Expense[s]"— "necessary expenses [Plaintiffs] incur during the 'period of restoration' that

---

[3]     Plaintiffs did not submit the Policy itself with their pleadings, but Defendant attached an ostensibly true and correct copy with its Motion to Dismiss (Doc. 31-1).  While we are typically limited to the pleadings when adjudicating a motion to dismiss, we are permitted to consider documents incorporated into a complaint by reference.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Here, Plaintiffs quote directly from the Policy throughout the Amended Complaint and do not otherwise challenge the propriety of Defendant's submission of the Policy alongside its motion.

[Plaintiffs] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss."  (*Id.*).

The Policy defines the "Period of Restoration" as beginning either "72 hours after the time of direct physical loss or damage for Business Income coverage," (or for Extra Expense coverage, "[i]mmediately after the time of direct physical loss or damage") and ending on the earlier of:

> (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
>
> (2) The date when business is resumed at a new permanent location.

(*Id.* at 63).

The Policy also provides coverage under a "Civil Authority" provision, which states:

> We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss

(*Id.* at 57).

Under both the "Business Income" and "Civil Authority" provisions, the "Covered Causes of Loss" are defined as "Risks of Direct Physical Loss unless the loss is" explicitly excluded or limited in the Policy.  (*Id.* at 67).  One of those

express exclusions is the "Exclusion of Loss Due to Virus or Bacteria"

endorsement (the "Virus Exclusion"), which provides:

> A. The exclusion set forth in Paragraph B. applies to all coverage under all forms and endorsements that comprise this Coverage Part, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

> B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

(*Id.* at 89).

## II.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to

judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirement of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint attacked by Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level…." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Accordingly, to satisfy the plausibility standard, the complaint must indicate that defendant's liability is more than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557.  Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679.  Next, the district court must identify "the 'nub' of the … complaint – the well-pleaded, nonconclusory factual allegation[s]." *Id.*  Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief.  *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips,* 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556–57).  Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

## III.   DISCUSSION

Under Pennsylvania law,[4] courts interpreting insurance policies "are guided by the polestar principle that insurance policies are contracts between an insurer

---

[4]     We will apply Pennsylvania law, rather than South Carolina law, here.

and a policyholder." *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020).

We therefore must "apply traditional principles of contract interpretation in

ascertaining the meaning of the terms used therein." *Id.* For instance, we need to

"ascertain the intent of the parties as manifested by the terms used in the written

insurance policy." *401 Fourth St. Inc. v. Invs. Ins. Grp.*, 879 A.2d 166, 171 (Pa.

2005). If the policy terms are clear and unambiguous, we must give effect to the

plain and ordinary meaning of those terms. *See Kurach*, 235 A.2d at 1116. If,

however, an ambiguity is identified in the policy, we must construe it in favor of

the policyholder. *Id.* Insurance provisions are considered ambiguous "if they are

subject to more than one reasonable interpretation when applied to a particular set

of facts." *Id.* (quoting *Madison Constr. Co. v. Harleysville Mut. Ins.*, 735 A.2d

---

Because we are sitting in diversity jurisdiction, we must apply the choice-of-law rules of the forum state. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir.2007). In Pennsylvania, courts apply "a flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Id.* at 227. In insurance contract disputes, "the court must apply the law of the state having the most significant contacts or relationships to the contract and not the underlying tort." *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. Ct. 2005). That intensive inquiry is only necessary, however, if there is a genuine conflict of laws between Pennsylvania and the other jurisdiction. *See Specialty Surfaces Intl. v. Continental Cas. Co.*, 609 F.3d 223, 230 (3d Cir. 2010). If there is no conflict of substantive law, then Pennsylvania law will apply. *See id.* ("When both states' interests would be harmed by the application of the other state's law, there is a 'true conflict,' and we must engage in the contacts and interests analysis to determine which state's law should apply.").

Here, both parties agree that South Carolina and Pennsylvania law are substantively similar in the pertinent areas of this dispute. Seeing no true conflict, we will apply Pennsylvania law. *See Illinois Union Ins. Co. v. Hydro Int'l, PLC*, 929 F. Supp. 2d 365, 372 (M.D. Pa. 2013) ("As a result of the substantial contacts between the contract and the Commonwealth of Pennsylvania, the interests involved, and the concession by both parties in their briefs that Pennsylvania and Oregon law are substantially similar with regard to the applicable substantive law, the Court will apply Pennsylvania law.").

100, 106 (Pa. 1999)).  "[T]he lack of a definition for an operative term," however, "does not necessarily render the policy ambiguous."  *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 847–48 (Pa. Super. Ct. 2020).

Here, the legal sufficiency of all three of Plaintiffs' claims depends on whether Defendant's denial of coverage pursuant to the Policy was reasonable.[5] Defendant asserts that coverage was properly denied for two main reasons.  First, Defendant argues that Plaintiffs' allegations are insufficient to bring their claim within the Policy's coverage grant for "direct physical loss of or damage to property," as is required.  Because Plaintiffs did not plead any "physical loss of or damage to" their property, the claim was appropriately denied.  Defendant argues

---

[5]    As discussed *supra*, Plaintiffs bring forth three causes of action: breach of contract (Count I), breach of the duty of good faith and fair dealing (Count II), and declaratory relief (Count III).  To state a claim for breach of contract in an insurance dispute, Plaintiffs must sufficiently plead (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages.  *See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).  If the insurer properly denied coverage, a breach of contract claim cannot stand.  *See, e.g.*, *Foster v. USAA Cas. Ins. Co.*, No. CIV.A. 10-5755, 2013 WL 6869034, at *7 (E.D. Pa. Dec. 31, 2013) ("Plaintiff cannot establish a claim for breach of contract because Defendant acted in accordance with the terms of the Policy when denying Plaintiff UIM coverage.").  Similarly, Pennsylvania courts have held that if the insurer properly denied a claim, the policyholder is unable to state a bad faith claim. *See Cresswell v. Pennsylvania National Cas. Ins. Co.*, 820 A.2d 172, 179 (Pa. Super. 2003) (citing *Morrison v. Mountain Laurel Assurance Co.*, 748 A.2d 689 (Pa. Super. Ct. 2000)).  And a judicial determination that coverage was properly denied would obviously preclude the availability of a declaration proclaiming the opposite.  *See, e.g.*, *Butta v. GEICO Cas. Co.*, 400 F. Supp. 3d 225, 233 (E.D. Pa. 2019) ("Judges in our district decline to issue a declaratory judgment when the claim for breach of contract would necessarily involve adjudication of the issues implicated in the claim for declaratory relief.").

that the Civil Authority provision was inapplicable because property damage must have been the cause of the Civil Authority action, because Plaintiffs did not allege "physical loss of or damage to" nearby property, and/or because access to the insured property must have been entirely prohibited, none of which occurred here. Second, even if Plaintiffs' claims did fall under either category of coverage, they would be barred by the Policy's Virus Exclusion.

Upon careful review of the Policy, the parties' well-briefed arguments, and the numerous decisions our colleagues within the Third Circuit have issued concerning these exact issues, we find that Defendant did indeed properly deny coverage and that Plaintiffs' Amended Complaint must therefore be dismissed.

### i. *Business Income*

Defendant agreed in the Policy's Business Income coverage provision to pay Plaintiffs for the loss of income sustained by the business due to any "necessary 'suspension' of [] operations." (Doc. 31-1 at 56). The Policy explicitly states that only losses incurred "during the 'period of restoration'" would be covered, and that the suspension of business operations must have been "caused by direct physical loss of or damage to property." (*Id.*). Plaintiffs argue that because the Policy does not define "direct physical loss," the provision is ambiguous—and since Plaintiffs' interpretation of the term (that the loss of the business's intended use or function can constitute "physical loss") is reasonable, the Motion must be denied. (Doc. 42

at 14).  We disagree and conclude that the phrase "physical loss of or damage to property" unambiguously requires some issue with the *physical* premises that impedes business operations and causes a loss of business income.

First, even though "physical loss" is not defined in the Policy, that does not render the term ambiguous.  *See, e.g.*, *Telecomm. Network Design v. Brethren Mut. Ins. Co.*, 5 A.3d 331, 336–37 (Pa. Super. Ct. 2010) ("[T]he fact that the term . . . is not defined and can imply several meanings is insufficient to create ambiguity.").  Rather, the term is clear when one considers the ordinary meaning of the words and when read in the context of the policy.  *See id.*  The word "physical"—which modifies both "loss" and "damage" in the Business Income provision—means "[o]f, relating to, or involving *material* things; pertaining to *real, tangible* objects." *Physical*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).  As a preeminent insurance treatise has explained, insurance policies that include "physical loss or damage" as a prerequisite for coverage have been "widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property."  10A *Couch on Ins.* § 148:46 (3d ed. 2020).  "When the structure of the property itself is unchanged to the naked eye, however, and the insured alleges that its usefulness for its normal purposes has been destroyed or

reduced, there are serious questions whether the alleged loss satisfies the policy trigger." *Id.*

This conclusion—that "physical loss" must require some tangible issue with the physical structure of the business's premises—is bolstered by reference to surrounding terms in the Policy.  As we have explained, the Business Income coverage provision explicitly states that only business losses incurred "during the 'period of restoration'" would be covered.  (Doc. 31-1 at 56).  The Policy explains that this "period of restoration" ends either when the covered premise is "repaired, rebuilt or replaced" or when business operations are "resumed at a new permanent location."  (*Id.*).  This language strongly implies that the Policy was only intended to cover business losses sustained over a period when the property had some physical or structural issue that prevented the business from operating.  If we adopt Plaintiffs' proposed construction—that "physical loss" could include a loss of the business's intended function—this language in the definition of "period of restoration," plus the phrase itself, would be rendered entirely superfluous.  We cannot issue an interpretation of a contractual provision that would lead to this result. *See Clarke v. MMG Ins. Co.*, 100 A.3d 271, 276 (Pa. Super. Ct. 2014) ("[Pennsylvania's] rules of construction do not permit words in a contract to be treated as surplusage . . . if any reasonable meaning consistent with the other parts can be given to it.") (quoting *Tenos v. State Farm Ins. Co.*, 716 A.2d 626, 631 (Pa.

Super. Ct. 1998)).  "Indeed," if we are "forced to choose between two competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the interpretation which allows us to give effect to all of the policy's language." *Id.* (quoting *Millers Cap. Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 716 (Pa. Super. Ct. 2007), *appeal denied*, 963 A.2d 471 (Pa. 2008)); *see also Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 289 (S.D.N.Y. 2005) (applying Pennsylvania law and concluding that the phrase "direct physical loss or damage," when considered in the context of the insurance policy, "requires that claimed loss or damage must be physical in nature").  Only Defendant's construction of the Business Income provision gives effect to all of the Policy's pertinent language and terms—Plaintiffs' does not.

Second, while the Third Circuit has not yet ruled on any COVID-19 insurance disputes, we are guided by relevant, binding precedent regarding what constitutes "direct physical loss of or damage to property" for insurance coverage purposes.  In *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, the Third Circuit considered whether buildings afflicted with asbestos sustained any "physical loss or damage" that could be covered by insurance.  311 F.3d 226 (3d Cir. 2002).  Looking to the "physical damage" component of the provision, the court noted that "[p]hysical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold" than damage "from an

outside source that may demonstrably alter the components of a building and trigger coverage," such as fire or water damage. *Id.* at 235. As for "physical loss," the Third Circuit distinguished between an asbestos contamination of such a large degree that the building is "uninhabitable and unusable," and a situation where asbestos is physically present in the building "but is not in such form or quantity as to make the building unusable[.]" *Id.* at 236. In the former scenario, the owner of the building has suffered a "distinct loss" because the function of the building is "nearly eliminated or destroyed, or the *structure* is made useless or uninhabitable." *Id.* (emphasis added). In the latter scenario, however, the owner of the building has not suffered any loss because the "structure continues to function—it has not lost its utility." *Id.*

The key terms in *Port Authority* are "building" and "structure." Plaintiffs here do not allege that the physical structure that houses their restaurant was physically unusable—just that the intended purpose of *the business* (serving food to patrons indoors) could not be executed due to the state's guidance to avoid public gatherings. But the Third Circuit in *Port Authority* clearly distinguished between a *building* (not a business) that was physically unusable and one that was contaminated but still physically safe to inhabit. There are no facts alleged here to support a conclusion that the building in which Mauldin's was located was rendered physically unusable. The business may have suffered economically, but

the building did not suffer any kind of physical or structural impairment as required to fall under the Business Income coverage provision.  To rule here that a building without any presence of the COVID-19 virus was rendered physically or functionally unusable such that Plaintiffs sufficiently alleged a "distinct loss" would squarely contradict the Third Circuit's holding in *Port Authority*.[6]

Finally, we are persuaded by the unanimity among our colleagues on this exact issue.  We have yet to identify a decision within the Third Circuit that has reached a result contrary to the one we reach today.  *See, e.g.*, *Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se.*, No. CV 20-2740, 2021 WL 289547, at \*6 n.4 (E.D. Pa. Jan. 28, 2021) ("Although the Court takes note of the growing body of case law in COVID-19 business interruption insurance cases, it makes an independent judgment. This is what is required. . . . Here, however, given the language of the Policy at issue, the Court does not disagree with the shared conclusion that loss or damage cannot merely be economic and still be 'physical.' That conclusion could conceivably be different if, for example, the policy language

---

[6]     Three years after *Port Authority*, the Third Circuit expressed its prediction that the Pennsylvania Supreme Court "would adopt a similar principle[.]"  *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005).  The *Hardinger* panel found "nothing . . . in New York, New Jersey, or Pennsylvania law that would cause us to disregard *Port Authority* under Pennsylvania law," nor did they see "any substantive law in Pennsylvania at odds" with the *Port Authority* decision.  *Id.*  And even though *Port Authority* was specifically concerned with asbestos, the *Hardinger* court clarified that the case is nonetheless "instructive . . . where sources unnoticeable to the naked eye have allegedly reduced the use of the property to a substantial degree."  *Id.*

stated that the coverage was triggered by 'loss of physical use of the property' or some such configuration.") (internal citation omitted); *1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc.*, No. CV 20-862, 2021 WL 147139, at *6 (W.D. Pa. Jan. 15, 2021) ("[T]he growing body of case law rejects the contrived definition of 'direct physical loss of or damage to' that would provide coverage for economic losses unrelated to physical impact to the covered structure. The Court believes that these cases represent the more reasonable interpretation of the policy language."); *Indep. Rest. Grp. v. Certain Underwriters at Lloyd's, London*, No. CV 20-2365, 2021 WL 131339, at *5 (E.D. Pa. Jan. 14, 2021); *Ultimate Hearing Sols. II, LLC v. Twin City Fire Ins. Co.*, No. CV 20-2401, 2021 WL 131556, at *6 (E.D. Pa. Jan. 14, 2021); *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, No. CV 20-1869, 2020 WL 7395153, at *5 (E.D. Pa. Dec. 17, 2020); *Kessler Dental Assocs., P.C. v. Dentists Ins. Co.*, No. CV 20-03376, 2020 WL 7181057, at *4 (E.D. Pa. Dec. 7, 2020); *4431, Inc. v. Cincinnati Ins. Cos.*, No. CV 20-04396, 2020 WL 7075318, at *10 (E.D. Pa. Dec. 3, 2020) ("To constitute direct 'physical loss' under the Policies as that term is construed under Pennsylvania law, economic loss resulting from an inability to utilize a premises as intended must (1) bear some causal connection to the *physical* conditions of that premises, which conditions (2) operate to completely or near completely preclude operation of the premises as intended.") (emphasis in original); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. CV 20-

3198, 2020 WL 6545893, at *4 (E.D. Pa. Nov. 6, 2020); *but see V&S Elmwood Lanes, Inc. v. Everest Nat'l Ins. Co.*, No. CV 20-3444, 2021 WL 84066, at *1 (E.D. Pa. Jan. 11, 2021) (declining to exercise jurisdiction over case seeking only declaratory relief because "Pennsylvania state courts have not yet developed a body of case law applicable to the state law issues presented in this case").

Though there has been a dearth of published Pennsylvania state court rulings on these issues, we have identified one that largely adopted the reasoning of our federal district court colleagues, but no others that addressed the merits of the various coverage arguments.[7] *See Scranton Club v. Tuscarora Wayne Mut. Group, Inc.*, No. 2020-02469 at 36 (Pa. Com. Pl. Lackawanna Cnty. Jan. 25, 2021) ("The Scranton Club has not alleged any facts which may arguably satisfy the 'direct physical loss or damage' requirement for . . . coverage under the policy. It also has not alleged the requisite repair, restoration, or replacement of its premises during its 'period of restoration.' Accordingly, it is clear and free from doubt that the Scranton Club cannot recover under the business income and extra expense provisions of the policy, and for that reason, Tuscarora's demurrer to those claims

---

[7]     Plaintiffs refer us to *Ridley Park Fitness, LLC v. Phila. Indem. Ins. Co.*, 2020 No. 01093 (Pa. Com. Pls. Phila. Cnty. Aug. 31, 2020), where Judge Glazer in the Philadelphia County Court of Common Pleas rejected an insurer's preliminary objections in a one-page, unpublished opinion.  Judge Glazer merely observed that "it would be premature for this court [to] resolve the factual determinations put forth by defendants to dismiss plaintiff's claims," but he provided no further analysis or any reasoning as to why plaintiffs had pled enough factual averments to survive dismissal.  (Doc. 42-1 at 2).

will be sustained.").  We are obligated, of course, to render an independent

adjudication of disputes that come before us, but the overwhelming consensus on

this issue, especially within our circuit, is certainly persuasive and difficult to

ignore.

While there have been decisions from other federal district courts that

support Plaintiffs' position, we decline to follow the reasoning of these holdings.

For instance, Plaintiffs cite to *Studio 417, Inc. v. Cincinnati Ins. Co.*, a decision

from the Western District of Missouri that denied the insurer's motion to dismiss.

478 F. Supp. 3d 794 (W.D. Mo. 2020).  There, however, the plaintiffs had alleged

that COVID-19 "particles attached to and damaged" its property, while Plaintiffs

here do not.  *See id.* at 802 ("Plaintiffs here have plausibly alleged that COVID-19

particles attached to and damaged their property, which made their premises unsafe

and unusable. This is enough to survive a motion to dismiss."); *see also Blue*

*Springs Dental Care, LLC v. Owners Ins. Co.*, No. 20-CV-00383-SRB, 2020 WL

5637963, at *6 (W.D. Mo. Sept. 21, 2020) ("As discussed earlier in this Order,

Plaintiffs plausibly allege that COVID-19 had physically occupied and

contaminated their dental clinics and thereby deprived them of their use of those

clinics by making them unusable.").  Plaintiffs also point to *Urogynecology*

*Specialist of Fla. LLC v. Sentinel Ins. Co., Ltd*, where a Middle District of Florida

court also denied an insurer's motion to dismiss.  *See* No. 20-CV-1174, 2020 WL

20

5939172 (M.D. Fla. Sept. 24, 2020).  There, however, the only issue the court discussed was whether the insurance policy's Virus Exclusion unambiguously foreclosed coverage—the court held the exclusion was ambiguous and declined to dismiss the case on the pleadings, without addressing the "physical loss" term in the Business Income provision.  *See id.* at *4 ("[W]ithout any binding case law on the issue of the effects of COVID-19 on insurance contracts virus exclusions, this Court finds that Plaintiff has stated a plausible claim at this juncture.").  Plaintiffs also refer us to a recent decision out of the Northern District of Ohio, where a federal judge granted summary judgment on behalf of an insured for its Business Income coverage claim.  *See Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*, No. 20-cv-01239, 2021 WL 168422 (N.D. Ohio Jan. 19, 2021).  There, the court, *inter alia*, concluded that the "physical loss" term was ambiguous and reasonably susceptible of more than one interpretation.  *See id.* at *10.  As we have discussed, we disagree, because interpreting "physical loss" as Plaintiffs request would render language in the "period of restoration" provision superfluous.  In short, we do not find these out-of-circuit cases persuasive.

Overall, we conclude that Defendant properly denied coverage under the Business Income coverage provision—the policy unambiguously required "physical loss of or damage to property," which must mean some physical

alteration to or issue with the structure, or some physical contamination inside the building, neither of which are alleged here.

ii. *Civil Authority*

In the Civil Authority coverage provision, Defendant agreed to pay "for the actual loss of Business Income [Plaintiffs] sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." (Doc. 31-1 at 57). This provision, like the Business Income coverage provision, expressly requires some nexus to "direct physical loss of or damage to property." (*Id.*). Unlike the Business Income provision, however, the Civil Authority provision requires "a covered cause of loss [that damages or causes a physical loss of] *another* property in the immediate area of the insured property, prompting a civil authority to respond to the covered cause of loss." *ATCM Optical, Inc. v. Twin City Fire Ins. Co.*, No. CV 20-4238, 2021 WL 131282, at * 6 (E.D. Pa. Jan. 14, 2021) (emphasis added). Plaintiffs here do not allege any loss of or damage to another property caused by any "covered cause of loss" that triggered an action of civil authority. Rather, Plaintiffs only allege that South Carolina's orders to avoid public spaces "constituted a prohibition of access to Plaintiffs' business property." (Doc. 22 at ¶ 62). But a plain reading of the Civil Authority coverage provision

unambiguously requires an allegation that *another* property, besides the insured premises, suffered some "physical loss" or "damage."  (Doc. 31-1 at 57).  Even if South Carolina's various orders did prohibit access to Mauldin's,[8] there is no allegation that the orders arose due to "direct physical loss of or damage to" nearby property.  *See Frank Van's Auto Tag, LLC*, 2021 WL 289547, at *7 ("Fatal to Frank Van's claim here, it would have to plead that there was a 'Covered Cause of Loss' to a nearby property. As with the Business Income and Extra Expense provisions, the shutdown order does not constitute a 'Covered Cause of Loss' for purposes of invoking the Civil Authority provision. This finding alone forecloses coverage under the Civil Authority provision.").  Therefore, we conclude Defendant properly denied coverage under the Civil Authority provision.

### iii. Virus Exclusion

According to Plaintiffs, Defendant's denial of their claim for insurance coverage "heavily relied on" the Policy's Virus Exclusion, which stated that

---

[8]     And such a conclusion might be a stretch.  The state's various orders and recommendations, at worst, prohibited citizens from dining indoors at Mauldin's—there is no allegation that the restaurant's owner(s), managers, or employees were specifically prohibited from accessing the building or operating the business for take-out dining or delivery.  Moreover, it appears from the pleadings that the only statewide order that explicitly required all state residents to limit movement outside their homes was issued *after* Defendant denied Plaintiffs' claim for coverage.  (Doc. 22 at ¶ 28).  Defendant denied coverage in a letter dated March 31, 2020, but Governor McMaster's stay-at-home order was issued later, on April 6.  (*Id.* at ¶¶ 28–29).  The earlier "orders" seem to be mere recommendations for residents to stay home where possible, (*Id.* at ¶¶ 24–27), and it is unclear whether those could constitute "action[s] of civil authority," much less actions taken "due to direct physical loss of or damage to [nearby] property," as required for coverage.  (Doc. 31-1 at 57).

Defendant would not "pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."  (Doc. 22 at ¶ 31).  Plaintiffs argue that the Virus Exclusion is inapplicable to their claims.  (Doc. 41 at 30).  Plaintiffs also assert that regulatory estoppel precludes Defendant from invoking the exclusion because Defendant, through the Insurance Service Office, "made statements to insurance regulators that the adoption of virus exclusion provisions was solely to clarify coverage and not reduce it, yet now it is invoking that exclusion to limit coverage."  (*Id.* at 32).

Because we concluded that Defendant properly denied coverage under the Business Income and Civil Authority provisions, we need not decide whether coverage would have nonetheless been precluded under the Virus Exclusion.  We do observe, however, that "several courts within this Circuit have [] concluded the language of the provision is not only unambiguous, but unambiguously bars coverage for COVID-19-related losses."  *Frank Van's Auto Tag, LLC*, 2021 WL 289547, at *8 (citing *Humans & Res., LLC v. Firstline Nat'l Ins. Co.*, No. 20-CV-2152, 2021 WL 75775, at *8 (E.D. Pa. Jan. 8, 2021)); *see also Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 20-CV-03342, 2020 WL 7024287, at *3 (E.D. Pa. Nov. 30, 2020) ("The language [in the Virus Exclusion] is not ambiguous, and it applies to Covid-19, which is caused by a coronavirus that

causes physical illness and distress. . . . Other courts considering [identical Virus Exclusion provisions] under other states' laws have reached the same conclusion. That means that the Virus Exclusion applies to [plaintiff's] insurance claim.") (collecting cases); *N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co.*, No. CV 20-05289, 2020 WL 6501722, at *5 (D.N.J. Nov. 5, 2020) ("The Court is only aware of one opinion in which a federal court did not find, at the motion to dismiss phase, that the Virus Exclusion barred coverage. . . . However, that [case's] policy and its exclusions referenced several other documents that were unattached to the insurance policy and were unavailable to the court. . . . Accordingly, based on the Court's independent evaluation of the Policy's Virus Exclusion and the wealth of well-reasoned opinions from other districts holding similarly, the Court finds that the Virus Exceptions bars coverage.") (citing *Urogynecology Specialist of Fla. LLC*, 2020 WL 5939172, at *4).

Because we conclude that Plaintiffs were ineligible for insurance coverage under the Business Income and Civil Authority coverage provisions in the Policy, even a successful argument that the Virus Exclusion was not intended to apply to COVID-19 cannot rescue the Amended Complaint.  Defendant properly denied coverage, and so Plaintiffs cannot state a claim upon which relief can be granted.

## IV.   CONCLUSION

For the foregoing reasons, we shall grant the Motion to Dismiss and dismiss the Amended Complaint.  A separate order shall issue in accordance with this ruling.